On August 15, 2000, the general counsel of the Alabama State Bar ("the Bar") filed formal charges against attorney James Harvey Tipler. The Bar's complaint presented five charges, alleging violations of the following Alabama Rules of Professional Conduct: Rule 1.15(a), Rule 1.15(b), Rule 1.15(c), Rule 8.4(c), and Rule 8.4(g), based on allegations that Tipler failed to satisfy a $487,714.80 referral fee agreement entered into between him and Francis "Sonny" James, the referring attorney. Tipler filed an answer on September 18, 2000, denying the allegations contained in the Bar's complaint. On March 20 and 21, 2001, a hearing was held before the Disciplinary Board of the Alabama State Bar ("the Disciplinary Board"). On March 22, 2001, the Disciplinary Board issued a "Report and Order," finding Tipler guilty of the charge that he had violated Rule 1.15(c), Ala. R. Prof. Conduct, and not guilty as to the other charges. Tipler was suspended from the practice of law for 91 days, upon the condition that the suspension would be reduced to 30 days if within 30 days of the date of the Report and Order Tipler deposited a certain sum of money into the trust account of either the attorney representing him in the disciplinary proceeding or the attorney representing him in a civil action filed by James. Tipler was also assessed for all costs incurred as a result of the proceedings. Thereafter, Tipler filed a motion to extend the time within which he would be required to deposit the required funds into the trust account of either of his attorneys; that motion was denied. On April 5, 2001, Tipler filed a "notice of appeal" to the Board of Disciplinary Appeals ("the Board of Appeals") of the Alabama State Bar. The Board of Appeals issued a "final order" on June 19, 2002, affirming the decision of the Disciplinary Board. Tipler thereafter timely appealed to this Court. The final brief associated with the appeal was filed with this Court on October 15, 2002.
The record supports the conclusion that on December 10, 1993, Charles Bentley, a client of James, who was a principal in James James, a law firm in Andalusia ("the James firm"), entered into a contract with the firm to represent him in a medical-malpractice/wrongful-death case arising out of the death of his wife. On December 13, 1993, James referred Bentley's case to Frank Tipler, Tipler's father,[1] of the Andalusia law firm of Tipler Tipler. Pursuant to the referral letter sent to Frank Tipler by James, Tipler Tipler would be entitled to 60% of any legal fees but it would be obligated to pay all costs associated with the litigation. Subsequently, Tipler became the lawyer responsible for Bentley's case. On April 13, 1994, Bentley signed a "retainer agreement" prepared by Tipler Tipler, which established a 50% attorney fee in the event there was any recovery on Bentley's claims. That agreement stated:
 "By this instrument, I employ TIPLER and TIPLER, attorneys at law, to represent me in connection with the medical negligence case. . ., and I agree to pay said attorneys a sum equal to 50% percent of all amounts recovered in this matter, plus any costs expended by them on my behalf, to be deducted after the fee is calculated, and I grant them a lien on any amounts recovered in this matter. *Page 1129 
 "If there is no recovery, I will owe said attorneys nothing."
(Capitalization original.) Tipler filed a complaint on behalf of Bentley; James was designated in the complaint as being "of counsel."
In 1997, Tipler tried the Bentley case before a jury in the Covington County Circuit Court, obtaining a verdict for the plaintiff of $2 million. The trial court's judgment entered on that verdict was appealed, and was affirmed by this Court in McKowan v. Bentley,773 So.2d 990 (Ala. 1999). The total judgment amount ultimately due, calculating interest that had accrued during the appeal, was $2,438,574.06. At the conclusion of the appeal, with Tipler's knowledge and approval, $659,261.20 of that judgment was transmitted by counsel for the defendant directly to the Internal Revenue Service and the Alabama State Revenue Department to satisfy tax liens filed against Tipler's property. The remaining $1,779,312.36 was then remitted to Tipler.
On September 22, 1999, he deposited that amount into his attorney trust account. The day before that deposit, the balance in the trust account was only $12,210.27. According to the bank records relating to the trust account, shortly after the $1,779,312.36 deposit, Tipler wrote a check out of the trust account for $50,000 payable to the Tipler Law Firm,[2]
which was deposited into the firm's operating account. Also soon after September 22, Tipler sent a check drawn on the trust account in the amount of $279,731.08 to the "Destin Bank," for payment on a line of credit he had with that bank. That check cleared the trust account October 4, 1999. At points between October 7 and 13, 1999, Tipler made disbursements to, or on behalf of, Charles Bentley and David Bentley, Charles's son who was entitled to share equally in the net recovery, totaling $1,194,380.29. That amount represented the balance remaining of their $1,219,287.03 (50% of the $2,438,574.06 total recovery), after Tipler deducted expenses of litigation aggregating $24,906.74. There is no dispute that the Bentleys received all of the proceeds to which they were entitled under their attorney fee agreement with the Tipler Law Firm. However, there is equally no dispute that the payments of the tax liens, the payment to the Tipler Law Firm's operating account, and the payment to the Destin Bank — totaling $988,992.28 — used up all but $230,294.75 of the proceeds allocable to attorney fees. The trust account records placed in evidence reflect that by October 19, 1999, only $15,995.74 remained in that account.
On October 7, 1999, Tipler faxed a letter to James, essentially advising him that Tipler believed there was an ethical problem with the referral fee. Also on October 7, Tipler transferred $200,000 out of the trust account to Copeland, Franco, Screws Gill, P.A., a Montgomery law firm, to settle a lawsuit brought against Tipler and his father by AmSouth Bank. Tipler testified that he made this transfer only "after we determined we were not going to pay [James's referral] fee." He explained that he had met with Dana Matthews, an attorney who practiced law in Florida and who had handled a prior "bar matter" for Tipler, at a restaurant in Florida on either October 6 or 7, and that at that time Tipler made "the final decision" not to pay the referral fee; shortly thereafter he transmitted the October 7 letter to James. Tipler testified before the Disciplinary Board *Page 1130 
that as of October 7, 1999, although he did not have in the trust account funds sufficient to pay the $487,714.80 referral fee due James under the referral letter providing that James would get 40% of any recovery, he could have paid it out of a line of credit available to him, but would have then had to pay interest on the money thus advanced to him. "It was obvious I was having some financial issues and I know that. That's there. But I had the capability of paying it and I was going to pay it."
Tipler told the Disciplinary Board that he was aware of the referral of the Bentley case to his father by James, but that he was not initially aware of the letter from James to his father documenting the referral, or of the fee contract between James and Bentley that allegedly accompanied the letter; he stated that he did not learn of the existence of those documents until later, at a point in time he could not precisely reconstruct. He explained that after Bentley's case was referred to his firm, it was directed "to my attention because I did all the medical negligence work. My dad was not doing anything at that point because he was in a declining state of health, so I started representing Mr. Bentley." Tipler testified that when he finally had access to the fee contract between the James firm and Bentley, he saw that it contained a clause that would cause the attorney fee to be significantly greater than the amount the client would receive under a straight 50% contingency-fee agreement. The provision in question stated that, in addition to receiving 50% of any recovery, "[s]aid attorneys shall receive all penalty and interest that may be allowed by any Appellate Court in case of an appeal, for their services."[3] Tipler testified that he became aware of the "penalty-and-interest" provision in the fee contract between Bentley and the James firm sometime between September 22, 1999, and October 7, 1999, upon his receipt by fax of a copy of the James firm's fee contract. Tipler explained that the fee contract between Bentley and James was not in his file, so he had requested that the James firm fax a copy to him. He testified that upon then becoming aware of the penalty-and-interest provision, he discerned what he believed to be an "ethical and legal" problem and decided to withhold payment of a referral fee to James. James testified, however, that Tipler would have received a copy of his fee contract with Bentley when he referred the case to Tipler Tipler in 1993. Tipler acknowledged that before he became aware of the interest-and-penalty provision, he and James had had confirmatory discussions regarding the disbursement of the attorney fees pursuant to the referral agreement. Specifically, Tipler testified:
 "Q: Prior to the time that this case was affirmed and after you tried it, did you have any conversations with Mr. James about the ongoing status of it?
 "A: Prior to the time of the judgment or prior to the appeal being —
 "Q: Prior to the time you got the judgment or the time it was affirmed?
"A: Yes, I did.
"Q: What was the general nature of those conversations?
 "A: Occasionally he would ask me how the appeal was going, and I said, we're just waiting. That was basically most of the conversations. I remember when I told him it was affirmed, we had more of a conversation then. *Page 1131 
 "Q: Was his expectation based on your conversation with him that he was going to receive a referral fee once the money was received?
"A: Yes, he was.
"Q: There was no question about that?
"A: No. It was my expectation too."
James also testified as to his discussions with Tipler regarding the disbursement of the attorney fees before Tipler raised any question concerning the payment of a share of those fees to James. Specifically, James testified:
 "Q: When did you first learn that the Supreme Court had affirmed the verdict?
 "A: Let me go on. One other conversation I had with Harvey that I think is — it was prior to learning of the affirmation of the Supreme Court. I learned it was common knowledge — obviously I do a lot of work in the probate office — it was common knowledge that Harvey had a number of tax liens filed against him, substantially.
". . . .
 "Q: I will be glad to ask a question. At any time did you have a conversation with Mr. Tipler regarding his tax liens and how that might affect your obtaining a referral fee?
"A: Yes, I did.
"Q: What was the nature of that conversation?
 "A: I actually went to see him, went over to his office and I talked to him. I said, it's common knowledge you have these tax liens against you and I'm wondering — I said, I don't know anything about this, but I'm wondering if it wouldn't be something smart for me to file something into court to protect myself. . . .
"Q: What did he tell you?
 "A: He told me there would not be any problem with that, that there could not be any problem with that. He was well aware of his tax problems and he explained to me that they related to some of his family's problems and some problems with Mr. Tipler's present wife . . . but he said I'm telling you, Sonny, there's not going to be any problems. That money will go into my trust account. The IRS cannot touch that money. I will write the referral fees out of the trust account and they can't touch the money.
". . . .
 "Q: When did you learn that he actually received the proceeds?
 "A: I was — well, there had been a motion for rehearing filed and Harvey had asked to — sent [sic] it over to his office and asked our opinion on what I thought any response might be to do [sic], and we were looking at that. . . . And my young associate and I were in the courthouse up in the law library . . . and there was Harvey.
 "And Harvey said, Sonny, come here a minute. I have something to tell you. . . . He said, I just want to tell you, the insurance company brought me a check so many days ago. . . .
 "Q: Did he say anything to you about when or where he would disburse the moneys you were entitled to?
 "A: He told me at that time we are going to have to let the check clear and said, we'll disburse next week sometime. He said, I'll get up with you and we will celebrate a victory next week. . . .
"Q: Did Mr. Tipler get up with you the next week?
 "A: Well, he didn't. . . . I caught Harvey there [at Tipler's office] at lunch and he told me — we went back into his office and we had a discussion then and he told me at that time he thought he was going *Page 1132 
to have to get an order out of the probate court affirming the distribution.
 "Well, we had a little bit of discussion and naturally I asked Harvey at that time what his fee — what had been the fee. . . . And I asked him, I said, you know what our referral contract is and he said, I'm not sure — I don't know what he said. I told him it was 40/60[4] is what I believed it was in accordance with the letter. He said whatever it was, that's what it was and he said he would honor it."
Tipler also testified that he was notified by Bentley that Bentley had not been aware of the fee-splitting agreement between the two law firms, that he did not consent to such a division, and that his case had been solicited by James before it was referred to Tipler Tipler.[5]
Tipler stated further that Bentley told him he had not signed the purported fee contract with the James firm. At the hearing before the Disciplinary Board, although Bentley could not recall signing a fee contract with James, when it was shown to him and he was asked if the signature on it purporting to be his was in fact his, he answered, "That's my signature." Tipler said that he could not recall the exact date on which he learned of the information regarding solicitation that he attributes to Bentley; however, he was certain that he was informed by Bentley of that information before the October 7 and October 13, 1999, disbursements of the client's proceeds. Bentley testified before the Disciplinary Board, however, that the first time he became aware that James was claiming a fee was between October 18 and 22, 1999. Tipler testified, however, that Bentley was "mixed up on time" because he had in fact told Tipler before October 18. Tipler subsequently retreated from the "prior to October 7" dating, however, to say it could have been after that.
James corroborated Bentley's testimony about the time frame, when he testified that he had had a discussion regarding the referral fee with Bentley sometime between October 18 and 22, 1999. James also testified that he had not solicited Bentley's case but that Bentley had been referred to him by a mutual friend; that Bentley actively pursued the idea of James's representing him in the medical-malpractice claim; that when James agreed to take on the case, Bentley understood that James would be referring it to Tipler Tipler; and that Bentley had indeed signed the fee contract. Also, Linda James, Francis James's wife and his law partner in the James firm, testified that Bentley came to the law office in December 1993 asking to see Francis and, because Francis was not present at the time, she discussed the matter with Bentley. He told her "he wanted to bring a medical-malpractice case." He asked her to handle it and was informed that it would be referred to Tipler 
Tipler. He told her he thought that "was a very good idea." She then prepared and explained to him, and he read and signed, the necessary paperwork, including the fee contract.
Tipler testified that when he learned of the details of Bentley's agreement with James, he believed that a potential ethical violation had occurred. Specifically, Tipler stated:
 "Q: When you deposited that money on 9/22, as you see in your bank statement, *Page 1133 
was it your intention to pay Mr. James a referral fee?
 "A: The only reason I hesitate at all is that at a certain point before distribution to the client I discussed this with Bar counsel, I discussed it with my client and the determination was made that it was inappropriate. I don't know if that was the 22 or after. I don't remember the exact date. But I expected to pay him a referral fee until I realized there were some problems."
Thereafter, Tipler contacted Dana Matthews for legal advice, who although licensed to practice law in Florida was not licensed to practice law in Alabama. Tipler testified that Matthews advised him that the information provided by Bentley reflected violations of the Alabama Rules of Professional Conduct and would prohibit a division of the fee. Tipler stated that Matthews told him "you just can't do it."[6] On October 7, 1999, after having received that advice from Matthews, Tipler faxed a letter to the James firm; that letter stated, in relevant part:
 "As you know, my law practice and life have been under intense scrutiny lately. I have gone over with my attorneys all aspects of my life and practice, including the Bentley fee situation. I regret to inform you that they have advised me that there is an ethical and legal problem with the fee share which you suggest.
 "I have been advised not to speak to either of you [Francis James or Linda James] about this, but to direct you to my personal attorney, Dana C. Matthews . . . ."
Tipler testified that he could not remember the exact date he first had discussions with any attorneys regarding the referral-fee issue, but that it would have been in either September or the first of October 1999. Upon receipt of Tipler's letter, James made repeated, yet unsuccessful, attempts to contact Dana Matthews by telephone and by letter. On October 15, 1999, James filed a complaint with the Bar against Tipler as a result of Tipler's failure to pay him $487,714.80, the 40% referral fee he believed he was entitled to.
On December 8, 1999, Tony McLain, general counsel for the Bar, sent a letter to Steven Schmitt, an Alabama attorney hired by Tipler after James filed the complaint with the Bar, in response to a letter Schmitt had sent him. In his letter McLain stated that he agreed the "proper forum" to resolve the referral-fee dispute between Tipler and James was in the court. At the hearing, McLain testified, "At that point we didn't have any documents from Mr. Tipler to show us how those disbursements had occurred. And as I recall, at this juncture what we were telling you is if they were going to litigate this in a civil forum, we would discontinue our investigation for now as it relates to that . . . ." On December 20, 1999, James sued Tipler in the Covington County Circuit Court for the referral fee.[7]
The Disciplinary Board found Tipler guilty of a violation of Rule 1.15(c), Ala. R. Prof. Conduct, which states:
 "When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be *Page 1134 
kept separate by the lawyer until there is an accounting and a severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept by the lawyer until the dispute is resolved."
(Emphasis added.) In its Report and Order, the Disciplinary Board stated, in pertinent part:
 "Just prior to the time for distribution to the client, and to the James firm, [Tipler] made a unilateral decision that payment to the James firm might be unethical based upon the language contained in the original fee agreement between the plaintiff and the James firm, although that fee agreement had been supplanted by a subsequent agreement between the plaintiff and the Tipler firm. Approximately a week later, [Tipler] also decided, or discovered, that no fee should be paid to the James firm because the mutual client then claimed that the case had been solicited by the James firm and that the client objected to the James firm receiving any portion of the fee. There was substantial and ongoing contact, inquiry, and discussion between [Tipler] and Sonny James concerning the expected date of disbursement, and only late in the process was Sonny James informed that there was a legal or ethical problem with the payment of the previously agreed fee.
". . . .
 "Faced with what [Tipler] describes as a legal or ethical problem in paying the James firm, the only action he took was to seek the advice from Florida counsel. He did not seek an opinion from the Office of General Counsel of the Alabama State Bar, nor did he
consult an Alabama lawyer, especially in light of the large amount of money in dispute. Another option available would have been to interplead the disputed funds into the appropriate court.
". . . .
 "After [Tipler] had full knowledge that there was a dispute or question as to the division of the legal fee, which was in his possession, and in his trust account, [Tipler], nevertheless, transferred all the remaining fee to either his general operating account, or to two other recipients. [Tipler] transferred $200,000 to pay a claim against him, the amount and payment date of which had been agreed upon by [Tipler's] lawyer and a third party. Another sum of $279,000 was sent to a bank in Destin, Florida[,] as payment on [Tipler's] line of credit loan.
 "The [Disciplinary Board] finds that [Tipler] had a pressing need for the subject funds, and would not have been able to easily meet the two debt obligations mentioned above if the James firm had been paid at that time, especially in view of the levy of the tax authorities.
 "Clearly, both [Tipler] and another person claimed interest in the property (money) in the possession of [Tipler] in his trust account. The property was not kept in a separate account pending resolution of the dispute and, instead, [Tipler] used all of the disputed property to his own use, all in violation of Rule 1.15(c)."
In arriving at an appropriate disciplinary sanction, the Disciplinary Board considered the various categories of aggravating factors and mitigating factors prescribed by the applicable Alabama Standards for Imposing Lawyer Discipline, including the fact that Tipler had been previously disciplined by the Alabama State Bar as well as by the Florida State Bar for violations of each state's respective Rules of Professional *Page 1135 
Conduct. The Disciplinary Board suspended Tipler from the practice of law for 91 days, effective May 1, 2001, upon the condition that if he deposited $487,714.80 into the trust account of either of his attorneys within 30 days of the order, the suspension would be reduced to 30 days.
The Board of Appeals, in its final order affirming the Disciplinary Board's order, addressed Tipler's contention, which he reiterates on appeal, that the finding of a violation of Rule 1.15(c) was clearly erroneous, as follows:
 "[Tipler] argues that the findings of the Disciplinary Board based upon the record as a whole are clearly erroneous. We disagree. The record indicates that [Tipler] only became involved in this case after the case was referred to his father by another attorney. There was a written agreement regarding the division of attorney's fees between [Tipler] and the referring attorney. More than five and one-half years passed following this agreement, and [Tipler] at no time disputed his obligations under the agreement regarding the division of attorney's fees. It was not until after the money was received by [Tipler] that any problems or concerns arose.
 "A review of the record reveals that [Tipler] never voiced or otherwise communicated any concern or other problem with the referring attorney until after the Internal Revenue Service and the State Department of Revenue levied and removed from the proceeds of the verdict monies owed by [Tipler] to these agencies while they were still in possession of the judgment debtor. [Tipler] acknowledged that he expected to pay a referral fee until he realized there might be some problems with him and the referring attorney and the Alabama State Bar if he did. (See 195-197). However, [Tipler] never contacted the Bar for advice despite the provisions of Rule 18 of the Rules of Disciplinary Procedure[,] which provide:
 "`RULE 18. CONDUCT NOT SUBJECT TO DISCIPLINARY ACTION. If, before engaging in a particular course of conduct, a lawyer makes a full and fair disclosure, in writing, to the General Counsel, and receives therefrom a written opinion, concurred in by the Disciplinary Commission, that the proposed conduct is permissible, such conduct shall not be subject to disciplinary action.'
 "The Order by [the Disciplinary Board] finds from the testimony and a review of the exhibits that [Tipler] had a pressing need for the subject funds and would not have been able to easily meet his debt obligations if he paid the referring firm given the actions of the Internal Revenue Service and the State Department of Revenue. Our review of the record leads us to the same conclusion.
 "Thus, we cannot find that the decision of [the Disciplinary Board] was `clearly erroneous' under the evidence presented and we cannot reverse on this basis."
Addressing Tipler's contention, which he phrases for review on appeal as "[t]he punishment imposed by [the Disciplinary Board] was manifestly excessive in relation to the needs and protection of the public, the profession and the administration of justice," the Board of Appeals stated:
 "The decision entered by [the Disciplinary Board] suspended Mr. Tipler for 91 days but afforded [Tipler] the opportunity to deposit $487,714.80 into his trust account within 30 days following the date of the Order. Since [Tipler] had testified during the course of the hearing that the reason he had not paid *Page 1136 
the referral fee to the referring attorney was that he found himself in a dilemma and that he believed that there was a reasonable possibility that the Bar might bring an action against him for paying a referral fee and had further testified that he had the capability of paying the fee and would pay the fee, it appears that [the Disciplinary Board], in its decision, afforded [Tipler] the opportunity to mitigate his punishment. The Order provided that if [Tipler] deposited the disputed proceeds into his attorney's trust account within 30 days the suspension would have been only 30 days. The effect of the Order afforded [Tipler] an opportunity to do what he had testified he could do.
 "The report issued by [the Disciplinary Board] outlines in great detail the factors set forth in Rules 3,4,5,6,7, and 8 of the Alabama Standards for Imposing [Lawyer] Discipline and that it made specific findings consistent with those standards. The Order found that [Tipler] had three aggravating factors and no mitigating factors. The form or extent of discipline imposed bore a direct relationship to [Tipler's] conduct, was not manifestly excessive, and was neither arbitrary nor capricious.
 "This Board does not believe that the punishment imposed by [the Disciplinary Board] amounts to a `death penalty' and therefore should be reversed. On the contrary[,] we find that the record in this case and the reasoned Order entered by the Hearing Officer of [the Disciplinary Board] carefully outlining the review and applications of the standards set forth by the Rules should not be disturbed."
As noted, Tipler contends on appeal (1) that based on the record as a whole the Disciplinary Board's finding of a violation of Rule 1.15(c), Ala. R. Prof. Conduct, was clearly erroneous, and (2) that the punishment imposed by the Disciplinary Board was manifestly excessive.
Rule 5.1(d), Ala. R. Disc. P., states, in pertinent part:
 "When proceedings before the Board of Disciplinary Appeals are conducted, the Board of Disciplinary Appeals shall affirm the decision under review unless it determines that, based on the record as a whole, the findings of fact are clearly erroneous or that the form or extent of the discipline imposed, when considered under the Alabama Standards for Imposing Lawyer Discipline, (1) bears no relation to the conduct, (2) is manifestly excessive or insufficient in relation to the needs and protection of the public, the profession, or the administration of justice, or (3) is arbitrary and capricious."
Concerning the standard of review we should employ upon this appeal, Tipler states in his brief to this Court that he "is aware of no decision which has established a standard of review" for such an appeal, but asserts that "[t]he standard of review is whether the [Disciplinary Board] and the Board [of Appeals] were wrong." (Tipler's brief at 2.) The Bar suggests a somewhat different standard, commenting and proposing as follows:
 "The Supreme Court of Alabama has inherent plenary powers of review in all matters involving the discipline of lawyers in this State. Since the Board of Disciplinary Appeals was required by Rule 12, Alabama Rules of Disciplinary Procedure, to review the Disciplinary Board's decision on a `clearly erroneous' standard, this Court must consider whether the Board of Disciplinary Appeals was incorrect in concluding that the Disciplinary Board's decision was not `clearly erroneous' based on its review of the record as a whole. In doing *Page 1137 
that, this Court must necessarily also look to the record as a whole from the Disciplinary Board's proceeding."
(Bar's brief at 2.)
We agree with the Bar's comment that the "clearly erroneous" standard is applicable to the Board of Appeals' review of decisions of the Disciplinary Board, but we note that the standard is required by Rule 5.1, not Rule 12.
Although we articulated the standard of our review in Asam v. AlabamaState Bar, 675 So.2d 866, 878 (Ala. 1996), the appeal procedure then prescribed by the Rules of Disciplinary Procedure was markedly different from that now in effect. When Asam was decided, Rule 5.1 had not yet been adopted; the Board of Appeals did not exist; and appeals from a Report and Order of the Disciplinary Board came directly to this Court. See Rule 12(f), Ala. R. Disc. P., before amendments effective August 1, 2000. Now, of course, an appeal from the Disciplinary Board must go first to the Board of Appeals, and Rule 5.1(d) provides for the scope and standard of the Board of Appeals' review. Rule 12(g) now provides that "[t]he parties have a right to appeal an adverse decision of the Board of Disciplinary Appeals to the Supreme Court of Alabama . . . ." No standard of review is prescribed for that second appeal.
We conclude that whether the Board of Appeals properly applied the "clearly erroneous" standard of review to the Disciplinary Board's findings of fact is a question of law. Likewise, all other legal conclusions in the final order of the Board of Appeals present questions of law to us. This Court reviews questions of law de novo. National Ins.Ass'n v. Sockwell, 829 So.2d 111 (Ala. 2002); Moss v. Williams,822 So.2d 392 (Ala. 2001); and Reed v. Board of Trustees of Alabama StateUniv., 778 So.2d 791 (Ala. 2000). Such a de novo review results in this Court's applying the same standard the Board of Appeals applied as to all questions of law, including the application by the Board of Appeals of the "clearly erroneous" standard to the Disciplinary Board's findings of fact. Thus, we must determine whether the Disciplinary Board's findings of fact were clearly erroneous.
"`A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395
(1948). See also Hamilton v. State, 677 So.2d 1254 (Ala.Crim.App. 1995); and Yancey v. State, 813 So.2d 1, 8-9 (Ala.Crim.App. 2001) ("a ruling is clearly erroneous if a reviewing court is left with the belief that a mistake has been committed"). Therefore, we will determine whether the evidence in the record as a whole compels us to a "firm conviction" that the Disciplinary Board was in error in finding Tipler in violation of Rule 1.15(c) and whether the sanction imposed by the Disciplinary Board was, using the language of Rule 5.1(d), "manifestly excessive," as Tipler contends.
The Disciplinary Board's findings of fact were in large part predicated upon the testimony personally given before it by Tipler, James, and Linda James. The Disciplinary Board was entitled to resolve all questions of the credibility of those witnesses and to determine all issues of conflicting testimony; and the Board of Appeals, and this Court, are to accord the Disciplinary Board's findings the benefit of the ore tenus presumption. See, e.g., Vann Express, Inc. v. Bee Line Express, *Page 1138 Inc., 347 So.2d 1353, 1358 (Ala. 1977) ("`the ore tenus rule mandates that a presumption of correctness be accorded a hearing examiner's findings of fact when he alone has heard the evidence,'" quoting SouthernHaulers, Inc. v. Alabama Pub. Serv. Comm'n, 331 So.2d 660, 663 (Ala. 1976)). See also McRae v. General Ret. Sys. for Employees of JeffersonCounty, 536 So.2d 71 (Ala.Civ.App. 1988); State Health Planning Res. Dev. Admin. v. Rivendell of Alabama, Inc., 469 So.2d 613
(Ala.Civ.App. 1985).
The facts critical to our analysis of the issues presently before us are (1) that Tipler knew, and had acknowledged to James, before October 7, 1999, that the James firm was entitled to a portion of the proceeds from the Bentley case under a referral agreement between it and the Tipler Law Firm, (2) that both before and after a dispute had arisen as to James's entitlement to that referral fee, Tipler used the bulk of the moneys in dispute to satisfy personal obligations rather than holding the portion of that money in dispute until the referral-fee dispute was resolved. In the process, the funds were all but completely depleted.
When Tipler received and began disbursing the proceeds from the Bentley case, he was aware, because of his knowledge of a referral arrangement between his firm and the James firm, that James, i.e., "another person," claimed an interest to a portion of those proceeds. Tipler was aware of James's interest in those proceeds from the beginning of his handling of the case even if the evidence is uncertain as to when Tipler became aware of the exact amount of that interest. A dispute arose as to James's interest in those proceeds at some point between September 22, 1999, and October 7, 1999, when Tipler allegedly became aware for the first time of the interest-and-penalty provision of the fee contract between the James firm and Bentley. He states that he also became aware before October 7 of Bentley's assertions that James had solicited the case and that he was not aware of any fee contract between him and the James firm, but the testimony of Bentley and James contradicted that statement. When Tipler became aware of a dispute as to the referral fee, he was required by Rule 1.15(c), Ala. R. Prof. Conduct, to keep the $487,714.80 in dispute in a separate account until the dispute was resolved. However, as Tipler admitted, he did not retain the disputed proceeds in his attorney trust account or in any other way attempt to keep them "separate" pending resolution of the dispute. Rather, he drew checks directly against his attorney trust account to the extent that the "portion in dispute" was almost all used to pay Tipler's personal or firm financial needs. In light of these facts, we cannot conclude with "definite and firm conviction," that the Disciplinary Board erred in its factual finding that Tipler violated Rule 1.15(c).
As noted, Tipler contends that the 91-day suspension imposed by the Disciplinary Board was manifestly excessive. Our review of the record shows that the Disciplinary Board afforded Tipler the opportunity to reduce his suspension to 30 days if he deposited $487,714.80 into thetrust account of either of his attorneys, as he had testified he was readily financially capable of doing and as Rule 1.15(c) requires, within 30 days of the date of the Disciplinary Board's order. That deposit not having been forthcoming, and given Tipler's prior reprimands by the Bar, we conclude that the Disciplinary Board's 91-day suspension of Tipler from the practice of law was not manifestly excessive.
For the foregoing reasons, Tipler's conviction for violating Rule 1.15(c), Ala. R. Prof. Conduct, and the sanctions imposed *Page 1139 
on him by the Disciplinary Board, are due to be affirmed.
AFFIRMED.
MOORE, C.J., and HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
[1] Tipler testified that his father died in December 1998.
[2] Apparently at some point the name of the law firm was changed from Tipler Tipler to the Tipler Law Firm.
[3] Tipler represents in brief that the interest on the judgment after the appeal was concluded "totaled over $438,574.06." At the hearing he testified that a disbursement according to the James firm fee contract would have resulted in the attorney's getting $1,400,000 and the client's getting $1,000,000.
[4] We infer that James meant he was to receive 40% and Tipler was to receive 60% in accordance with the terms of the fee letter sent by James to Frank Tipler.
[5] This information is supported by a signed, but un-notarized "affidavit" of Bentley in the record, which was prepared for his signature by Tipler's secretary, and by Bentley's hearing testimony.
[6] The record contains no affidavit or testimony from Matthews. Tipler explained to the Disciplinary Board that "[h]e's on a long-planned family vacation this week or he would be here."
[7] Tipler hired attorney Steven Schmitt to represent him in the action before the Bar; he hired attorney Robert D. Segall to represent him in the civil action filed by James in the Covington County Circuit Court.