WOODALL, Justice.
The Alabama State Bar (“the Bar”) and Lawrence Johnson Hallett, Jr., a member of the Bar, appeal and cross-appeal, respectively, from a decision of the Board of Disciplinary Appeals of the Alabama State Bar (“the Board”), which reversed in part an order of a panel of the Disciplinary Board of the Alabama State Bar (“the panel”); the panel had disciplined Hallett after finding that he had violated Rules 1.5(a), 1.5(e), 1.8(a), and 8.4(g), Ala. R. Prof. Cond. We reverse and remand.

I. Factual and Procedural Background

This disciplinary action arose out of an action commenced in December 1999 by Carol J. Earheart to dissolve her marriage to Joel Earheart. On March 23, 2000, Mrs. Earheart engaged J. Daniel Morrow to represent her in that action. The marital estate included real property valued in excess of $1 million and three ongoing businesses valued at $5-6 million. Mrs. Earheart was the chief financial officer of those companies. The divorce action also involved issues regarding the custody of the couple’s two minor children.
*1130 The divorce action was set for trial on September 27, 2000. On September 5, 2000, Morrow introduced Mrs. Earheart to Hallett. At that meeting, they discussed whether Hallett should represent Mrs. Earheart. On September 14, 2000, before Mrs. Earheart agreed to hire Hallett, Morrow and Hallett agreed in writing that Hallett would pay Morrow 25% of the fee he earned in representing Mrs. Earheart.
Four days later*, on September 18, 2000, Mrs. Earheart signed a “Retainer Agreement and Promissory Note” (“the retainer agreement”). The retainer agreement provided, in pertinent part:
“1. I, CAROLYN [sic] EARHEART, do hereby hire and retain the services of LAWRENCE J. HALLETT, JR., Attorney at Law. I do further affirm that I have read, understand and do affix my signature to this instrument evidencing the fact that I owe to the same LAWRENCE J. HALLETT, JR., One Hundred Thousand Dollars and no/100 Dollars ($100,000) attorney fees plus any and all costs advanced, court costs, paralegal fees or any other costs incurred in this matter as evidenced by invoices rendered during and a final invoice rendered upon completion of this matter. All such sums are considered a part of this agreement and Promissory Note which represents fees and costs incurred. It is further agreed and understood that any and all costs advanced or incurred, court costs, paralegal fees or any other costs incurred in this matter are in addition to the Attorney Fees and are due and payable upon rendering of Invoice for said costs, fees and advances. I further acknowledge that LAWRENCE J. HALLETT, JR., [sic]
“2. The parties hereby acknowledge that they have this day paid the sum of $ 0 as a retainer against current and future invoices and I owe and Promise to Pay the balance shown on each and every invoice submitted to me upon rendering an invoice for any and all costs advanced or incurred, court costs, paralegal fees or any other costs incurred in this matter in addition to professional legal services rendered. PAYMENTS TO BE PAID AT THE FIRST OF EACH MONTH, LATE AFTER THE 15TH OF EACH MONTH.
“3. I acknowledge that the full amount is due and owing immediately and I agree and understand that if I am unable to pay the full amount I shall be responsible for interest of 1⅜% per month on the unpaid balance plus the costs incurred for additional amounts due including the costs of collection and reasonable attorney’s fees.
“4. I further understand that if I fail to comply with this agreement and do not have the balance paid by my court date that, LAWRENCE J. HAL-LETT, JR. can withdraw from the case or seek other legal remedies. This debt will be turned over to a collection agent to collect the balance and all costs associated therewith will be my responsibility including all costs for the collection including attorney’s fees.
“5. I have read and understand this instrument in its entirety and I fully understand and agree to its terms and conditions.”
That same day, Mrs. Earheart also signed a “promissory note,” which stated, in pertinent part:
“For value received, the undersigned Carol Jean Earheart (‘the Client’) ... promises to pay to the order of Law *1131 rence J. Hallett, Jr. (‘the Attorney’), • ■ • the sum of $100,000.00 with interest from September 15, 2000, on the unpaid principal at the rate of 12.00% per an-num.
“Unpaid principal after the Due Date [1] shown below shall accrue interest at a rate of 18.00%.
“The unpaid principal and accrued interest shall be payable on demand.
“If any installment is not paid when due, the remaining unpaid balance and accrued interest shall become due immediately at the option of the Attorney.
“The Client reserves the right to prepay this Note (in whole or in part) prior to the due date with no prepayment penalty.
“If any payment obligation under this Note is not paid when due, the Client promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.
“This Note is secured by Any and All Real Estate or Personal Property in which Carol Jean Earheart has an interest in or receives an interest to as a result of any court action [in] which she is a party, dated September 15, 2000. The Attorney is not required to rely on the above security for the payment of this Note in the case of default, but may proceed directly against the Client.
“If any of the following events of default occur, this Note and any other obligations of the Client to the Attorney, shall become due immediately, without demand or notice:
“1. the failure of the Client to pay the principal and any accrued interest in full on or before the Due Date;
“2. The death of the Client(s) or Attorney®;
“3. the filing of bankruptcy proceedings involving the Client as a Debtor; “4. the application for appointment of a receiver for the Client;
“5. the making of a general assignment for the benefit of the Client’s creditors;
“6. the insolvency of the Client; or “7. the misrepresentation by the Client to the Attorney for the purpose of obtaining or extending credit.
“In addition, the Client shall be in default if there is a sale, transfer, assignment, or any other disposition or any assets pledged as security for the payment of this Note, or if there is a default in any security agreement which secures this Note.”
(Emphasis added.)
These documents (hereinafter referred to collectively as “the fee-agreement documents”) were not drafted by Hallett. Instead, they were prepared by Dwight Bowman, who was employed by Hallett as a paralegal. Mrs. Earheart’s testimony regarding the fee-agreement documents varied widely. She testified (1) that she did not sign the fee-agreement documents, (2) that she did sign the fee-agreement documents, (3) that she lied under oath when she said she signed the fee-agreement documents, and (4) that she does not remember signing the fee-agreement documents. Her own handwriting expert opined that the signatures on the fee-agreement documents were hers. For the purposes of this appeal, we assume that she signed the fee-agreement documents.
At Hallett’s instance, the trial was postponed until October 13, 2000. Bowman *1132 allegedly spent 2-3 hours a day, 3 or 4 days a week with Mrs. Earheart, in preparing for the trial.
The trial began on Friday, October 13, and concluded at midday on Tuesday, October 17. Hallett appeared for Mrs. Earh-eart at trial. Issues at trial included allegations that both parties had engaged in domestic violence; that Mr. Earheart was guilty of adultery; that Mrs. Earheart had embezzled money from the family businesses; and that Mrs. Earheart had written worthless checks to a gambling casino in Mississippi for which criminal charges were pending against her.
A judgment of divorce was subsequently entered awarding Mrs. Earheart (1) custody of the children, (2) two parcels of real property, and (3) 25% of the value of Mr. Earheart’s retirement account. Regarding that real property, the judgment stated:
“[Mr. Earheart] is to transfer to [Mrs. Earheart] all of his right, title and interest in and to said property within thirty (30) days. ... In the event [he] fails, refuses or neglects to convey said property, ... then the Circuit Clerk of this Court is authorized ... to execute said conveyance in [Mr. Earheart’s] behalf upon submission by counsel of the deed to the Circuit Clerk.”
Mr. Earheart was awarded 100% interest in the family businesses, as well as visitation rights with the children. Further, he was ordered to pay child support of $1,500 per month. The court “reserved the issue of alimony” and awarded “a judgment against [Mr. Earheart] in the amount of $5,000 as additional spousal support to be applied towards a reasonable attorney’s fee.”
On December 7, 2000, Hallett moved to alter, amend, or vacate the judgment. In that motion, he sought, among other things, an award of alimony. He also sought a “judgment against [Mr. Earh-eart] in the Amount of $50,000.00 towards a reasonable attorney fee for such a complex divorce and custody matter,” plus an “amount of $585.00 representing expense in production of documents.”[2] (Emphasis added.) The trial court denied the motion as to those requests.[3] Mr. Earheart paid $5,000 into court as ordered “to be applied towards a reasonable attorney’s fee.” Hal-lett received $2,100 of that fee, but did not credit it to Mrs. Earheart’s account.[4]
After the judgment of divorce had been entered, Mrs. Earheart visited Hallett at his office to discuss the status of her case. The essence of the alleged conversation is revealed in the following colloquy before the panel:
“Q. [By counsel for the Bar:] What did he say to you about the divorce and the decision?
“A. [By Mrs. Earheart:] He told me that he had made me a millionaire and that what else did I want. And he was really harsh speaking with me. And I said: ‘Well, what are my options here?’ And he said: ‘Well, you can appeal it.’ And I was dissatisfied with the divorce.
[[Image here]]
*1133 “Q. Did you ... were you happy with the outcome of the divorce?
“A. No.
[[Image here]]
“Q. What did you tell him?
“A. Well, I told him that I was going to be destitute very shortly after the divorce was rendered. And—
“Q. What did you mean by that?
“A. Well, I was unemployed. I had got no alimony, fifteen hundred dollars a month child support for two children, a house note of four thousand two dollars a month, [and] a vehicle note for seven fifty-six a month. So I was going to be shortly in trouble. And Mr. Hallett stated that I needed to sell my assets.
“Q. And had you planned on doing that?

“A. No.”

(Emphasis added.)
Mrs. Earheart did, indeed, sell one of the parcels of real estate she was awarded in the divorce judgment. It was Hallett’s role in that transaction that triggered this action by the Bar.
The sale on the property was set to close on January 12, 2001. Surety Land Title, Inc. (“Surety”), was serving as the closing agent. As of January 11, however, Mr. Earheart had not executed a deed to the property as the trial court had ordered. On that date, Shirley Harley, an employee of Surety, contacted Hallett and requested a circuit clerk’s deed in order to prepare the necessary closing documents, because, according to Harley’s affidavit testimony, she had been told that Hallett was holding such a deed. Hallett sent Harley a copy of a circuit clerk’s deed, along with a copy of the as-yet-unrecorded promissory note, with notice that he was relying on the promissoiy note as security for $110,942.78 in attorney fees and interest for his representation of Mrs. Earheart. Harley informed Mrs. Earheart’s real-estate agent that the sale could not close without resolution of the attorney-fee claim.
That same day, January 11, 2001, Hal-lett prepared a billing statement; the total of the statement was $110,942.78. The billing statement included $4,000 in interest computed at 12% beginning September 15, 2000. It also included $6,942.78 in “research costs with Westlaw; copying costs; deposition costs; discovery costs; [and] postage costs.”
Mrs. Earheart first learned of Hallett’s claim to the proceeds on the day of closing on the sale of the property when she received a copy of the United States Department of Housing and Urban Development Settlement Statement showing that the $110,942.78 was to be deducted as “settlement charges.” She telephoned Hallett from the closing and protested the fees. When she and her real-estate agent suggested placing the proceeds in an escrow account pending resolution of the dispute, they were told that Surety had already remitted funds in the amount of $110,942.78 to Hallett. Hallett split the fee with Morrow pursuant to their agreement.[5]
On January 17, 2001, Mrs. Earheart wrote a letter to Hallett terminating his representation. In that letter, she also demanded a “complete itemized list” (emphasis in original) of Hallett’s time attributable to his representation of her, as well as a “complete list and itemization” of attendant expenses. On January 21, 2001, Hallett sent Mrs. Earheart an invoice, *1134 which, according to Hallett, was prepared by Bowman (hereinafter “the Bowman invoice”). The Bowman invoice totaled $130,235.53, which included the principal amount of $100,000, plus $4,000 interest on the promissory note from September 15, 2000, through January 15, 2001, at a rate of 12%. After crediting Mrs. Earheart for $110,942.78, the invoice showed $19,292.75 as an outstanding debt. The total number of hours reflected on the invoice as having been spent on the matter was approximately 311.
Subsequently, Mrs. Earheart sued Hal-lett in the Mobile Circuit Court. Those claims have been dismissed and are not at issue in this case. Hallett developed colon cancer and was hospitalized for treatment. While Hallett was incapacitated from the cancer, Bowman allegedly opened a large number of credit accounts in Hallett’s name, resulting in a loss to Hallett of approximately $200,000, and Hallett filed for bankruptcy protection.
Mrs. Earheart filed an adversary complaint against Hallett in the United States Bankruptcy Court for the Southern District of Alabama. Her complaint included counts of conversion and misrepresentation, alleging that the debt resulting from Hallett’s misconduct was nondisehargeable in bankruptcy. For example, according to the bankruptcy court’s “order on complaint" entered on November 9, 2006, “Mounts one and two of [Mrs.] Earheart’s complaint allege that Hallett converted approximately $111,000 in proceeds from the sale of [her] home, and the deed and real property itself by failing to deliver the clerk’s deed to [Mrs.] Earheart.” The complaint also alleged that Hallett had misrepresented to Mrs. Earheart “the terms of his employment.” The bankruptcy court concluded that the evidence before it did “not support a finding of conversion.” It deemed evidence of misrepresentation to be “conflicting and unreliable” and, consequently, held that “[Mrs.] Earheart [had] failed to prove that Hallett misrepresented the terms of his employment and the $100,000 fee.” The bankruptcy court, therefore, entered a judgment in favor of Hallett on Mrs. Earheart’s adversary complaint.
Mrs. Earheart filed a complaint against Hallett with the Bar, and on January 27, 2005, pursuant to Ala. R. Disc. P. 12(e)(1), the Bar filed a petition for disciplinary action with the disciplinary clerk of the Bar, alleging that Hallett had violated a number of the Alabama Rules of Professional Conduct in connection with his representation of Mrs. Earheart, including (1) Rule 1.1 (“Competence”), (2) Rule 1.3 (“Diligence”), (3) Rule 1.5 (“Fees”), (4) Rule 1.7(b) (“Conflict of Interest: General Rule”), (5) Rule 1.8(a) (“Conflict of Interest: Prohibited Transactions”), and (6) Rule 8.4(g) (“Misconduct”). Hallett filed his answer on March 4, 2005, denying the substantive allegations.
On July 25, 2007, following a hearing on the charges, the panel entered its judgment. After setting forth extensive findings of fact, the panel held that Hallett had violated Rule 1.5(a) and (e), Rule 1.8(a), and Rule 8.4(g). A majority of the panel found Hallett not guilty of violating Rule 1.1 or Rule 1.3. The panel suspended Hallett from the practice of law for 90 days. It further suspended Hallett for an additional 18 months, but made the additional suspension conditional on Hallett’s failure to make restitution in the amount of $40,000. Full restitution of the $40,000 at any time during the 18-month period would void the order imposing the conditional suspension. Hallett appealed.
The Board affirmed the panel’s decision in part and reversed it in part. It affirmed the panel’s holding as to the violation of Rule 8.4(g). However, it held that *1135 the panel’s findings that Hallett had violated Rule 1.5(a) and (e) and Rule 1.8(a) were clearly erroneous. The Board also vacated the discipline imposed by the panel and ordered, instead, a public reprimand with general publication. The Bar appealed (case no. 1071419), and Hallett cross-appealed (case no. 1071486).

II. Discussion

“When proceedings before the Board of Disciplinary Appeals are conducted, the Board of Disciplinary Appeals shall affirm the decision [of the panel] unless it determines that, based on the record as a whole, the findings of fact are clearly erroneous ....” Ala. R. Disc. P. 5.1(d) (emphasis added).[6] When the panel’s findings are based on oral testimony, the “Board of Appeals, and this Court, are to accord the [panel’s] findings the benefit of the ore tenus presumption.” Tipler v. Alabama State Bar, 866 So.2d 1126, 1137 (Ala.2003). “ ‘ “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” ’ ” Id. (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), quoting in turn United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

A. Case No. 1071119

The Bar contends that the Board merely “reweighed the evidence and reached its own conclusions, substituting its judgment for that of the [panel]” and that the Board thus “violated the standard of review.” The Bar’s brief, at 36. “[W]hether the Board of Appeals properly applied the ‘clearly erroneous’ standard of review to the [panel’s] findings of fact is a question of law,” which we review de novo. Tipler, 866 So.2d at 1137.
The panel concluded that Hallett had violated two provisions of Rule 1.5, namely, subsections (a) and (e). Those subsections provide:
“(a) A lawyer shall not enter into an agreement for, or charge, or collect a clearly excessive fee. In determining whether a fee is excessive the factors to be considered are the following:
“(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
“(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
“(3) The fee customarily charged in the locality for similar legal services;
“(4) The amount involved and the results obtained;
“(5) The time limitations imposed by the client or by the circumstances;
“(6) The nature and length of the professional relationship with the client;
“(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;
“(8) Whether the fee is fixed or contingent; and
“(9) Whether there is a written fee agreement signed by the client.
[[Image here]]
*1136 “(e) A division of fee between lawyers who are not in the same firm, including a division of fees with a referring lawyer, may be made only if:
“(1) Either (a) the division is in proportion to the services performed by each lawyer, or (b) by written agreement with the client, each lawyer assumes joint responsibility for the representation, or (c) in a contingency fee case, the division is between the referring or forwarding lawyer and the receiving lawyer;
“(2) The client is advised of and does not object to the participation of all the lawyers involved;
“(3) The client is advised that a division of fee will occur; and
“(4) The total fee is not clearly excessive.”
The panel found that the fee Hallett charged Mrs. Earheart was clearly excessive in violation of Rule 1.5(a) and that it involved the improper “division of [a] fee between lawyers who are not in the same firm,” as prohibited by Rule 1.5(e).

1. Violation of Rule 1.5.

Regarding Rule 1.5(a), the panel stated:
“The Panel, having heard the testimony of respondent as to the Bowman invoice ... and having examined it, finds that many of the entries contained in it are clearly fraudulent, and even where not clearly a fraud, are excessive and show evidence of having been manufactured after the fact, and after a dispute had arisen ... as part of which the client demanded an invoice.”
(Emphasis added.) The panel discussed several exemplary entries:
“[Tjhere is an entry for October 18, 2000, for eight hours, allegedly for Mr. Bowman’s attendance in court assisting [Hal-lett]. However, the trial had been concluded by mid-day on October 17, and this identical entry and charge appears for October 13 (10 hours), October 16 (10 hours), and October 17 (8 hours), the latter for a half-day of court; October 17 further includes 4.25 hours of ‘preparation’ for an already-concluded hearing. October 16 includes time asking for information as to whether the judge had signed the divorce, before the trial was concluded. Fifteen hours were recorded to review one set of handwritten notes prepared by [Mrs. Earheart] as an outline. Oh October 12 (the day before trial), fourteen subpoenas were recorded as being prepared, at one billable hour each. Few of those were served, and even fewer were called as witnesses. Except for Mrs. Earheart’s children, none appear to have even been interviewed. One and one-half hours are charged for recording the Promissory Note/lien against [Mrs. Earheart’s] property.”
(Emphasis added.)
The panel also noted that the Bowman invoice sought payment for “$8,198.03 for largely unspecified and undocumented expenses.” In fact, that entry states only “total reimbursable expenses,” without any explanation or specification of what these expenses included. Moreover, there are two entries for December 12, 2000, totaling $4,831.08, which are entirely blank except for the date and the amount. The panel also pointed out that Hallett’s explanation for the $6,942.78 expense on the January 11, 2001, billing statement, namely, “research costs with Westlaw; copying costs; deposition costs; discovery costs; [and] postage costs,” did not identify any deposition, discovery event, or Westlaw research.
Hallett does not attempt to refute these findings. He offers, for example, no expía- *1137 nation for the seemingly fraudulent and manufactured invoice entries noted by the panel. Indeed, in testimony before the panel, he asserted that he did not keep contemporaneous records of his time, because he regarded the $100,000 fee as a “flat fee,” the total amount of which was earned upon the execution of the retainer agreement. Hallett’s position on that issue was evidenced in the following colloquy:
“Q. [By counsel for the Bar:] You didn’t keep up with your hours or the time that you devoted to this case, did you?
“A. [By Hallett:] I have a fairly good idea, but I didn’t keep a record of it.
“Q. No contemporaneous written order [sic] at all?
“A. It was a flat fee.
“Q. But my question was: ‘Did you keep a record of your time and expenses in this case?’
“A. I wouldn’t keep a record of time on a flat fee.
“Q. Because you didn’t intend to account to Ms. Earheart for any time that you expended on her behalf, did you?
“A. It was a flat fee.
“Q. You didn’t intend to account for any time that you spent in this case to Ms. Earheart, did you?
[[Image here]]
“A. No. I didn’t intend to keep time because it was a flat fee, and I didn’t have to.
“Q. Are you not aware that you have an obligation to account to your clients for your time and expenses in any case?
“A. I have a flat fee arrangement. She is a grown, intelligent woman, relatively sophisticated. She had a lawyer. Why would I keep time on a flat fee case?
[[Image here]]
“Q. You are not aware that you should keep time records?
“A. I am not aware that I should keep records on a flat fee case .... That is correct.
“Q. So, it is your position that once you had, Ms. Earheart sign that retainer agreement and sign that promissory note that your $100,000 plus interest was earned?

“A. That’s correct.”

(Emphasis added.)
In that connection, however, the panel observed: “Even a flat or fixed fee ... must be returnable to the extent of any un-eamed portion. [Hallett] testified that he regarded the entire fee as being fully earned upon execution of the contract, and that no part of it was refundable or subject to cancellation.” (Emphasis added.) The panel’s observation is correct. The Bar argues, and we agree, that Hallett’s contention is tantamount to defending charging a nonrefundable retainer, which is forbidden in Alabama. It is well settled that nonrefundable retainers are prohibited. See Taylor v. Alabama State Bar, 587 So.2d 1205 (Ala.1991); Rule 1.16(d), Ala. R. Prof. Cond. (“Upon termination of representation, a lawyer shall ... refundf ] any advance payment of fee that has not been earned.”); J. Anthony McLain, Opinions of General Counsel, “Lawyers’ Trust Account Obligations with Regard to Retainers and Set Fees,” 70 Ala. Law. 65, 66 (January 2009) (“all retainers and fees are refundable to the extent that they have not yet been earned”).
The panel’s findings were also informed by the factors listed in Rule 1.5(a)(1) — (9), most particularly, the factors listed in subsections (4) (“[t]he amount involved and the results obtained”) and (7) (“[t]he experience, reputation, and ability of the law *1138 yer or lawyers performing the services”). The panel stated:
“The results of the divorce proceedings were problematic for Mrs. Earh-eart, resulting in an order granting her two pieces of real estate with an aggregate net value of approximately $600,000 (of which Mrs. Earheart already had been a half-owner before the divorce), 25% of Mr. Earheart’s retirement account (the value of which was never established, but which was later liquidated by settlement for approximately $25,000), child support as set by the domestic relations guidelines, and primary custody of the children. That order reserved a determination of alimony, but none was ever awarded, and ordered the husband to pay $5,000 toward his wife’s attorney fees. ...”
(Emphasis in original; footnotes omitted.)
Moreover, there is no explanation why, if $50,000 — the figure Hallett sought in his postjudgment motion — was a reasonable attorney fee, a fee of twice that amount is not excessive. Neither is there any explanation as to why Mrs. Earheart was not given a credit for the money Hallett received from Mr. Earheart or why Hallett began computing interest on the principal on September 15, 2000, that is, three days before the retainer agreement was signed. Based on the record as a whole, the panel’s finding that the fee charged by Hallett was excessive is not clearly erroneous.
The panel also found that Hallett’s payment of $25,000 of the fee to Morrow violated Rule 1.5(e), which limits the circumstances under which fees may be divided. Rule 1.5(e)(4) provides, in part, that “[a] division of fee between lawyers who are not in the same firm, including a division of fees with a referring lawyer, may be made only if ... the total fee is not clearly excessive.” Because we conclude that the panel’s finding that the fee was excessive is not cleai'ly erroneous, it follows that a finding that Rule 1.5(e) has been violated is, likewise, not clearly erroneous. We, therefore, pretermit any discussion of any of the other requirements of Rule 1.5(e).

2. Violation of Rule 1.8(a)

The panel also held that Hallett had violated Rule 1.8(a), Ala. R. Prof. Cond., which provides:
“A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:
“(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
“(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
“(3) The client consents in writing thereto.”
(Emphasis added.)
As a preliminary matter, it must be noted that the three subdivisions are stated in the conjunctive. In other words, a lawyer may not “knowingly acquire an ownership, possessory, security, or other pecuniary interest” in the client’s property unless all the conditions set forth in all three subdivisions are satisfied.
It is undisputed that the promissory note purported to give Hallett a security interest in Mrs. Earheart’s property, and, for the purposes of this opinion, we are regarding her signature on the promissory note as genuine. The Board held, however, that the Bar “failed to establish that there was anything about the fee agree *1139 ment that was not fair and reasonable to the client.” (Emphasis added.) The Bar contends that this holding fails to “employ the proper standard of review.” The Bar’s brief, at 61. We agree.
The panel found that the conditions of Rule 1.8(a)(1) were not met. In addition to the excessiveness and, therefore, the unreasonableness of the fee, the panel regarded the language of the fee-agreement documents as “inconsistent” and “almost incomprehensible.” Indeed, a cursory review of the fee-agreement documents reveals a number of ambiguities or irregularities potentially harmful to Mrs. Earheart.
First, the full amount of the fee, plus interest, was arguably due on demand at any time at Hallett’s option. This is so, because, according to the promissory note, “[t]he unpaid principal and accrued interest [was to be] payable on demand.” Elsewhere, the promissory note provided for the acceleration of the balance, with interest, upon any default of any installment payment “at the option of [Hallett].” This construction is bolstered by Hallett’s testimony that he regarded the entire principal amount and interest to be due and payable as of September 18, 2000, when Mrs. Earh-eart signed the fee-agreement documents. Second, although the promissory note references a “Due Date [as] shown below,” no due date actually appears in either of the fee-agreement documents. Third, the amount of interest is indeterminable. The rate was 12% per year according to the promissory note, 16% per year according to the retainer agreement, and 18% per year if not paid by an undefined due date. Finally, the retainer agreement is incomplete on its face. Paragraph one concludes with the following incomplete sentence: “I further acknowledge that LAWRENCE J. HALLETT, JR..”
These aspects of the fee-agreement documents fully support the panel’s finding that the transaction was neither “fair and reasonable to the client [nor] fully disclosed and transmitted ... in a manner that [could] be reasonably understood by the client.” Thus, the panel’s finding that Hallett was guilty of violating Rule 1.8(a) was not clearly erroneous.[7]

B. Case No. 107U86

The Board upheld the panel’s finding that Hallett was guilty of violating Rule 8.4(g), and Hallett cross-appeals as to the punishment the Board imposed for that violation. Rule 8.4(g) provides: “It is professional misconduct for a lawyer to ... [e]ngage in any ... conduct that adversely reflects on his fitness to practice law.” Hallett does not challenge the Board’s af-firmance of the panel’s determination that he violated Rule 8.4(g). In other words, for the purposes of these proceedings, Hal-lett concedes that he engaged in “conduct that adversely reflects on his fitness to practice law.” In his words: “As the sole reason for Hallett’s cross-appeal, this Court should modify the discipline imposed by the Board as its penalty for violation of 8.4(g).” Hallett’s brief, at 17. In fact, both parties challenge the Board’s modification of the panel’s discipline.
The panel suspended Hallett from the practice of law for 90 days and imposed an additional suspension of 18 months, to be voided if Hallett paid restitution of $40,000. The Board modified the discipline imposed by the panel, ordering a public reprimand with general publication.
*1140 “When proceedings before the Board of Disciplinary Appeals are conducted, the Board of Disciplinary Appeals shall affirm the decision under review unless it determines ... that the form or extent of discipline imposed, when considered under the Alabama Standards for Imposing Lawyer Discipline, (1) bears no relation to the conduct, (2) is manifestly excessive or insufficient in relation to the needs and protection of the public, the profession, or the administration of justice, or (3) is arbitrary and capricious. No error shall be predicated on any ground not presented to the Disciplinary Board or the Disciplinary Commission.”
Rule 5.1(d), Ala. R. Disc. P. (emphasis added).[8] Thus, the question before this Court is whether the discipline imposed by the panel bore “no relation to the conduct,” was “manifestly excessive,” or was “arbitrary or capricious.”
“Arbitrary and capricious action has been defined as willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.” Heinmiller v. Department of Health, 127 Wash.2d 595, 609, 903 P.2d 433, 440 (1995). A “ ‘decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles.’” Mississippi Dep’t of Human Servs. v. McNeel, 869 So.2d 1013, 1018 (Miss.2004) (quoting Miss. State Dep’t of Health v. Natchez, 743 So.2d 973, 977 (Miss.1999)). Thus, so long as the discipline imposed bears a rational relationship to the lawyer’s conduct, is not manifestly excessive, and is authorized for such conduct by the applicable disciplinary rules, it is not arbitrary and capricious.
In vacating the $40,000 restitution[9] ordered by the panel, the Board reasoned: “[Sjince the fee was not shown to be clearly excessive, there was no basis to order Hallett to return any portion of his fee; indeed, to do so in light of the bankruptcy order discharging him from any debt to Ms. Earheart might very well be problematic.” (Emphasis added.) According to the Bar, this reasoning is flawed for two reasons. First, it contends, and we agree, that the excessiveness of the fee was sufficiently established to withstand appellate review.
As to the relevance of the bankruptcy order, the Bar contends that Hal-lett did not assert the bankruptcy order as a defense in the proceedings before the panel and, therefore, that any error was not preserved. See Rule 5.1(d) (“No error shall be predicated on any ground not presented to the [panel].”). We agree.
Rule 3(b), Ala. R. Disc. P., provides: “Except as otherwise provided in these rules, the Alabama Rules of Civil Procedure and the Alabama Rules of Appellate Procedure shall apply.” “Rule 8(c), Ala. R. Civ. P., governing affirmative defenses, requires that a party ‘set forth affirmatively ... discharge in bankruptcy .... ’ Subject to exceptions not shown to be here applicable, the affirmative defense of a bankruptcy discharge is waived if not affirmatively pleaded in accordance with Rule 8(c).” Systrends, Inc. v. Group 8760, LLC, 959 So.2d 1052, 1064 (Ala.2006). The affirmative defense of a discharge in bank *1141 ruptcy was not raised in Hallett’s answer and therefore has been waived. Thus, the potential effect of the order of the bankruptcy court formed no part of a proper rationale for vacating the panel’s disciplinary order.
In discussing the excessiveness of the fee, the panel stated:
“[T]he total fee (exclusive of undocumented expenses) charged for the thirty days of employment through trial (and the small activity thereafter) totaled over $117,000, coupled with more than $13,000 of expenses, only approximately $2,920 of which were itemized. Mr. Hal-lett testified that his customary hourly charge would have been at most $200.00 per hour, so that, even crediting the testimony as to more than three hundred hours in thirty days, a resulting fee ivould have been at most $75,000.”
(Emphasis added; footnote omitted.)
Reducing the attorney fee in the retainer ($100,000) by the amount the panel ordered in restitution ($40,000) yields $60,000, the precise amount the panel found attributable to 300 hours in 30 days of employment at $200 per hour. Thus, the restitution bears a direct relation to the conduct and is not manifestly excessive.
Regarding the suspension ordered by the panel, suspension from the practice of law is “generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system.” Standard 7.2, Alabama Standards for Imposing Lawyer Discipline. Standard 7.2 is expressly applicable in cases such as this one involving “clearly excessive or improper fees.” Standard 7.0, Alabama Standards for Imposing Lawyer Discipline (“Violations of Duties Owed to the Profession”). Suspension is also appropriate under Standard 4.3 (“Failure to Avoid Conflicts of Interest”) “when a lawyer knows of a conflict of interest and does not fully, disclose to a client the possible effect of that conflict and causes injury or potential injury to a client.” Standard 4.32.
In addition, Standard 9.0, Alabama Standards for Imposing Lawyer Discipline, sets forth specific “aggravating and mitigating circumstances [that] may be considered” in imposing discipline “[ajfter misconduct has been established.” The aggravating factors include:
“(a) prior disciplinary offenses;
“(b) dishonest or selfish motive;
“(c) a pattern of misconduct;
“(d) multiple offenses;
“(e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency;
“(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
“(g) refusal to acknowledge wrongful nature of conduct;
“(h) vulnerability of victim;
“(i) substantial experience in the practice of law;
“(j) indifference to making restitution.”
Standard 9.22, Alabama Standards for Imposing Lawyer Discipline. The mitigating factors include:
“(a) absence of a prior disciplinary record;
“(b) absence of a dishonest or selfish motive;
“(c) personal or emotional problems;
“(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
*1142 “(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
“(f) inexperience in the practice of law;
“(g) character or reputation;
“(h) physical or mental disability or impairment;
“(i) delay in disciplinary proceedings; “(j) interim rehabilitation;
“(k) imposition of other penalties or discipline;
“(l) remorse;
“(m) remoteness of prior offenses.”
Standard 9.32.
The panel found six aggravating factors to be applicable, namely, those set forth in Standard 9.22(d), (f), (g), (h), (i), and (j). These findings were not clearly erroneous. There was clear — or unchallenged — evidence of violation of multiple sections of the Alabama Rules of Professional Conduct, namely, Rule 1.5(a) and (e), Rule 1.8(a), and Rule 8.4(g). See Standard 9.22(d). In a number of instances, the panel disbelieved Hallett’s exculpatory testimony, see Standard 9.22(f), and those findings by the panel are subject to the presumptions attendant the ore terms rule. Tipler, supra.
To be sure, the panel also found two notable mitigating factors, namely, those set forth in Standard 9.32(a) (Hallett had no “prior disciplinary record”) and Standard 9.32(g) (Hallett enjoyed a good reputation). However, in weighing all the factors, it cannot be said that the panel disciplined Hallett in a “form or extent” that “(1) bears no relation to the conduct, (2) is manifestly excessive ..., or (3) is arbitrary and capricious.” Rule 5.1(d). Thus, the Board erred in vacating and modifying the discipline imposed by the panel.

III. Conclusion

In summary, the Board violated the standard of review insofar as both guilt and discipline are concerned. Consequently, the Board’s judgment is reversed, and the cause is remanded for the Board to affirm the panel’s judgment.
1071419 — REVERSED AND REMANDED.
1071486 — REVERSED AND REMANDED.
COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the result in part and dissents in part.

. Although this appears to be a defined term in the promissory note, the “Due Date” is not specified.

. The panel construed this language as “a prayer for an award of $50,000 as a reasonable fee.” Hallett does not challenge this characterization of his request.

. Mrs. Earheart appealed the divorce judgment, but neither Morrow nor Hallett represented her on that appeal.

.The remainder of the $5,000 was paid to Hallett's successor, who represented Mrs. Earheart in her appeal from the judgment of divorce.

. Morrow eventually surrendered his license to practice law and is currently on disability/inactive status.

. On September 12, 2008, this Court issued an order rescinding Rule 5.1, Ala. R. Disc. P., effective October 6, 2008. In that same order, it adopted Rule 12.1, which provides, in pertinent part, that "[t]he Board of Disciplinary Appeals shall remain in effect ... for the limited purpose of disposing of pending matters.”

. In its appeal, the Bar also challenges the Board’s modification of the discipline imposed by the panel. The Bar requests that in reversing the Board's order, we should order that the discipline imposed by the panel be reinstated. Our discussion of that contention is consolidated with our discussion of Hal-lett’s cross-appeal.

. See note 6, supra.

. Restitution is a disciplinary device expressly authorized by Rule 8(i)(l), Ala. R. Disc. P.